## PEOPLE *v.* KERT.

1. PERJURY—EVIDENCE—VERDICTS.

    In prosecution for perjury, testimony justified jury in finding that questions, asked defendant as witness while testifying before examining magistrate in a prosecution for conspiracy to obstruct justice, were material and that he had committed perjury (Act No. 328, § 423, Pub. Acts 1931).

2. SAME—DEFINITION.

    While perjury is defined as a wilful false swearing in regard to any matter or in respect to which such oath is authorized or required, it is always necessary to show that the perjury was in regard to a material fact (Act No. 328, § 423, Pub. Acts 1931).

3. CRIMINAL LAW—PERJURY—PREJUDICE—NEW TRIAL.

    In prosecution for perjury even if trial court erroneously submitted question of materiality of questions asked defendant, such error was not prejudicial to defendant where trial judge concurred in jury's finding they were material by denying new trial (Act No. 328, § 423, Pub. Acts 1931).

4. SAME—WITNESSES INDORSED ON INFORMATION—PRODUCTION BY PROSECUTION.

    In a criminal prosecution wherein the name of a witness has been indorsed on the information at the request of defendant, it is necessary for the prosecution to produce him (3 Comp. Laws 1929, § 17254).

5. WITNESSES—SELF-INCRIMINATION—CONSTITUTIONAL LAW—DISCRETION OF COURT.

    A witness is not the sole judge of whether an answer to a question will incriminate him or not and it is largely discretionary with the trial judge in the first instance to determine whether the witness should be obliged to answer or not when the witness invokes his constitutional privilege against

self-incrimination, and a ruling resulting from the exercise of such discretion will not be reversed in the absence of manifest error (Const. 1908, art. 2, § 16).

6. SAME—SELF-INCRIMINATION—DISCRETION OF COURT—POLICE INSPECTOR—CAFE OWNER.

In prosecution of cafe owner for perjury committed while testifying before examining magistrate in prosecution for conspiracy to obstruct justice by public officials and police officers, including a police inspector, which latter prosecution was an outgrowth of an investigation in a one-man grand jury proceeding, trial judge did not abuse discretion in sustaining refusal of police inspector whose name had been indorsed on information in perjury prosecution at request of defendant therein to answer questions as to whether the inspector had met defendant or had taken meals at defendant's cafe which was located adjacent to and connected with a gambling place, on the ground that the answer might tend to incriminate him (Const. 1908, art. 2, § 16).

7. CRIMINAL LAW—PERJURY—PRELIMINARY EXAMINATION—ONE-MAN GRAND JURY.

On appeal from conviction for perjury of witness at preliminary examination of a police inspector who with other police officers and public officials had been charged with conspiracy to obstruct justice as a result of an investigation in a one-man grand jury proceeding, it was unnecessary to discuss nature of the one-man grand jury proceeding.

8. PERJURY—PRELIMINARY EXAMINATION A LEGAL PROCEEDING.

Preliminary examination held by a circuit judge sitting as examining magistrate, which was an outgrowth of a one-man grand jury proceeding that resulted in preferment of charges of conspiracy to obstruct justice by various police officers and other public officials, was a legal proceeding at which false testimony by a witness could form the basis for prosecution for perjury (3 Comp. Laws 1929, §§ 17118, 17217, 17218; Act No. 328, § 423, Pub. Acts 1931).

9. SEARCHES AND SEIZURES—WARRANTS—ONE-MAN GRAND JURY.

The constitutional prohibition as to unreasonable searches and seizures does not apply to warrant issued by circuit judge, acting as a one-man grand jury for purpose of investigating into gambling and matters in connection therewith in the county (Const. 1908, art. 2, § 10; 3 Comp. Laws 1929, §§ 17118, 17217, 17218).

Appeal from Recorder's Court for the City of Detroit; Van Zile (Donald A.), J. Submitted October 16, 1942. (Docket No. 98, Calendar No. 41,703.) Decided January 4, 1943. Rehearing denied April 6, 1943.

Charles Kert was convicted of perjury. Affirmed.

*Morris H. Marks* (*Gerald K. O'Brien,* of counsel), for appellant.

*Herbert J. Rushton,* Attorney General, *Edmund E. Shepherd,* Solicitor General, *William E. Dowling,* Prosecuting Attorney, and *Charles W. Jones* and *Henrietta E. Rosenthal,* Assistant Prosecuting Attorneys, for the people.

BUTZEL, J. Charles Kert was charged with having committed perjury while testifying at the examination of a large number of defendants before Honorable Homer Ferguson, a circuit judge for Wayne county, sitting as a magistrate and conservator of the peace in the case of People v. Elmer Ryan, James Watkins, et al. The case before the magistrate was the outgrowth of an investigation in a one-man grand-jury proceeding, which resulted in charges of a conspiracy to obstruct justice being made against Elmer Ryan and others, including a large number of public officials and police officers, Inspector Watkins among them. At the examination before the magistrate, it became important to show that the defendants had conspired to obstruct justice, in that some of them had paid, and others received pay, for failing to enforce the antigambling laws. It also became important to show the connection of James Watkins, a police inspector, as well as other police officers, with such conspiracy. Kert was sworn as a witness, and it is charged that he thereupon committed perjury in testifying in regard to Watkins.

Kert owned a two-story building consisting of five stores with apartments above them in the city of Detroit, Michigan. Three of the stores were connected together and were used by Kert as a tavern for the sale of food and drinks. The two adjoining stores were rented to one Lou Snyder, who used them and the basements below for a gambling house. One Jack Leventon was associated with Snyder, and both Snyder and Leventon were defendants in the case of People v. Ryan, et al. Kert was not a defendant, but was called as a witness by the prosecution in the examination before the magistrate. It is charged that while acting as a witness it became a material question whether Kert knew defendant Watkins, whether Watkins had visited or eaten in Kert's tavern, and whether patrons ever went through the cafe to the gambling house by entering the cafe and going down to the basement and then into the gambling house or handbook next door. It was charged that, at the examination, Kert, in reply to these questions, committed perjury in testifying that he did not know Watkins, that Watkins had never visited or eaten in his cafe, and that patrons did not go to the gambling house or handbook next door by entering the cafe, going down to the basement, and then up into the handbook.

We shall briefly refer to Kert's testimony in the grand-jury proceeding. He refused to identify positively Inspector Watkins, stating that he had met him only twice at the police station: once while obtaining a license for a dog, and another time in regard to some other strictly official business; that he had never seen Watkins in his tavern but had met him at the station; that he had met Watkins only twice or possibly three times, but never seen him in the tavern. Almost all witnesses against Kert in the instant case were very reluctant in testifying. One waitress stated that she had seen Inspector

Watkins at Kert's cafe on two or three occasions; twice he was talking to Kert; that "The first occasion when I served Mr. Watkins was a few months before March or April, 1938. On that occasion Mr. Kert, for one, told me that was Inspector Watkins. Mr. Snyder asked me to see what the gentleman would have; Mr. Snyder was in the bar at the time he told me. Inspector Watkins was sitting in the dining room adjoining the bar room. I only knew it was Inspector Watkins by what I was told; told by Mr. Kert and Mr. Snyder. No one else told me that was Inspector Watkins." She also stated that she had testified in the grand-jury proceedings, that she heard Kert speak very highly of Inspector Watkins; "they were always kidding each other and shaking hands and slapping on the back when they did so, and I always was under the impression they were very good friends." Another waitress testified that she had seen Inspector Watkins in the cafe a number of times, that she had never seen him while Kert was there but she had heard Kert tell how he had met Watkins on a hunting trip; that she had been persuaded by Kert and his wife and Leventon to go back to the grand jury and change her testimony in regard to her identification of Watkins. She also testified that upon one occasion she had served Inspector Watkins and three other police officers after Lou Snyder had told her, "You serve Inspector and the boys, and I will take care of it later." The bill was later paid her in the handbook. Another waitress testified on occasions she would fill Snyder's orders in the cafe and later collect the bills from him in the gambling house next door. The additional charge made against Kert that he testified that Watkins had not visited nor eaten in his cafe was not borne out by words to that effect,

but by implication from Kert's statement that he had never seen him in his tavern.

The building itself is peculiarly arranged. According to the testimony, both basements under the two stores adjoining Kert's tavern, in addition to the stores, were at times used by Snyder and Leventon for gambling purposes. In the rear of Kert's tavern there was an outside stairway that led down into a narrow vaulted chamber or tunnel that ran back of the entire building. From it, doorways led to the basements of the various stores, including the ones leased to Snyder and Leventon and used for gambling purposes. Kert was asked whether there was a door between his basement and that of the handbook, a connecting door. He replied:

"No, sir. Wait a minute. There is an aisle in the back part of it."

He was further asked whether his saloon was used as an entrance to the handbook and he replied that it was not ever so used.. It was shown that patrons of the handbook went through the saloon or tavern or back part of it in order to enter the handbook. One of the doors on the ground floor in the rear of the handbook had a little slot in it that would enable one on the inside to see those who sought entrance.

Kert in his testimony before the magistrate testified that both Snyder and Leventon occasionally came to his tavern for food and drink, that Inspector Arthur Ryckman, Sgt. Harry. Finney, Sgt. Edward Burnett, Sgt. William Welke, Sgt. Flaugher, Sgt. Alex. Kennedy of the police department as well as others, all defendants in the case of People v. Ryan, et al., visited the tavern. It is apparent from reading the testimony that the patrons of the gambling house frequently visited the defendant's place

of business and that police officers, defendants in the case, also went there for food and drink. There would be nothing criminal or extraordinary in police officers or other officials going to a tavern for food and drink, but when it is considered that the building was laid out with a connection between the tavern and the adjoining part of the building used for a gambling house, through a back door from one to the back door of the other, or through the tunnel or aisle at the rear of the building on the basement level, that the frequenters of the gambling house visited the tavern, and that officers of the law, defendants in the case, frequented the place, the inference is irresistible that these officers countenanced gambling and that Kert's cafe was a place where officers met and must have known that gambling was going on next door. This would become very competent and material, though not at all conclusive, in a case where police and officers of the law were also charged with complicity in a conspiracy to permit gambling. It thus became material to show in the chain of evidence whether Inspector Watkins was a frequenter of Kert's tavern. In view of the testimony in the case, the jury were fully justified in finding that the questions asked Kert were material and that Kert had committed perjury.

The trial judge permitted the introduction of testimony as heretofore outlined. He had to pass upon the materiality of questions when propounded. While perjury under section 423 of the Michigan penal code, 3 Comp. Laws 1929, § 16564, as reenacted by Act No. 328, Pub. Acts 1931 (Comp. Laws Supp. 1940, § 17115–423, Stat. Ann. § 28.665), is defined as a wilful false swearing in regard to any matter or in respect to which such oath is authorized or required, it is always necessary to

show that the perjury was in regard to a material fact. See 2 Gillespie's Michigan Criminal Law and Procedure, p. 1901, § 1669, and cases cited therein. The judge in his charge submitted the materiality of the testimony to the jury who decided against defendant. Defendant argues that this question should not have been left to the jury, that the judge should have decided it; but even if defendant is correct, defendant was not harmed in any way. because the judge, who admitted the testimony, evidently also was under the impression that it was a question of fact which should be submitted to the jury. Even if the verdict of the jury were not conclusive of a finding that the perjured testimony was material to the issue, the judge in refusing a new trial concurred in its decision. If the jury were mistakenly given the question of materiality, there is no error when the court concurs in its verdict. The correct rule is stated in *People* v. *Bradbury,* 155 Cal. 808, 815 (103 Pac. 215), as follows:

"Appellant argues that by reason of the conflict in instructions, whereby in one the jury is told it must determine the materiality of the evidence; while in the other it is told that such materiality is always a question of law for the court to decide, should work a reversal of the case. But this conflict could not have been injurious to the defendant and must have made for his benefit; for, if the jury were led to the erroneous belief that they could decide upon the materiality of the evidence and had decided that it was not material, the defendant would have obtained an acquittal to which he was not entitled. The fact that under such an erroneous instruction the jury has decided the question of the materiality correctly, as here it did, furnishes no ground for reversal. *Thompson* v. *People,* 26 Col. 496 (59 Pac. 51); *State* v. *Lewis,* 10 Kan. 157; 22 Am. & Eng. Ency. of Law, 688."

See, also, *Carter* v. *State,* 181 Ark. 665 (27 S. W. [2d] 781).

The name of Inspector Watkins had been indorsed on the information at the request of defendant and, therefore, it became necessary for the prosecution to produce him.* Prior to his being called as a witness, and in the absence of the jury, the attorney representing Inspector Watkins and another inspector stated that his clients were under indictment and that he was advising them that they should stand on their constitutional rights † and refuse to answer questions that might tend to incriminate them. The court stated that they had a perfect right to do this. The prosecution presented Watkins as a witness but did not examine him, since his attorney objected, claiming his constitutional right against self-incrimination. Watkins, however, was examined by the attorney for defendant who first asked whether he knew one of the waitresses who had testified against defendant. Watkins' attorney thereupon objected for the reasons theretofore given. The objection was sustained. Other questions were also asked, but Watkins refused to answer any question except to reply that he had never been hunting at any time in his life, that he owned no hunting equipment or paraphernalia. One of the witnesses had testified that she had heard Kert say that Watkins had been on a hunting trip with him. Defendant claims it was error not to compel Watkins to reply to the questions asked, that a witness has not the absolute right to refuse to answer all questions on the ground that it might be incriminating; that he solely has the option to refuse, and then it is the duty of the

---

* See 3 Comp. Laws 1929, § 17254 (Stat. Ann. § 28.980).—Reporter.

† See Const. 1908, art. 2, § 16.—Reporter.

judge to determine whether the testimony would be incriminating or not. See *In re Watson,* 293 Mich. 263. This unquestionably is true, but the judge as a rule must exercise caution so as not to deny a witness his constitutional rights against self-incrimination. Watkins was a defendant in a case in which his connection with gambling was at issue, and if he had gone to Kert's cafe adjoining the gambling house, it might be a very important link in the chain of circumstances that tied him up with the gamblers. This also would be true of his meeting defendant Kert and others at the cafe, or taking meals there. These were the main questions that were asked and we can readily see how his answers, if they corroborated other witnesses, might tend to incriminate him. Kert did not testify. While there is no question that the witness is not the sole judge of whether the answer to the question will incriminate him or not, it is largely discretionary with the judge in the first instance to determine whether the witness should be obliged to answer or not, when he invokes his constitutional privilege. The correct rule is stated in *Russell* v. *United States* (C. C. A.), 12 Fed. (2d) 683, 693:

"The judge, who saw the witness and who heard the government's testimony, * * * believed the claim of incriminating tendency was made in good faith, and that the witness was entitled to assert the privilege. In the absence of manifest error, this ruling should not be reversed."

Appellant attacks the one-man grand-jury proceeding which preceded the hearing before the examining magistrate notwithstanding the opinion in *People* v. *St. John,* 284 Mich. 24, and the cases that followed out of similar proceedings, but in which the question was not again raised. It is not even necessary to discuss the question as the perjury

charged took place in the examination before the examining magistrate, not in a grand-jury proceeding.

It is further claimed that there is no competent testimony to show that it was a legal proceeding in which Kert had testified. Such charge is completely answered by the testimony of the first court reporter in the proceeding before the examining magistrate to the effect that he had taken down the testimony and acted as such reporter in the examination of People v. Elmer Ryan, et al., conducted before the Honorable Homer Ferguson sitting as a magistrate and conservator of the peace. The other court reporters testified in a briefer manner, but to the same effect. The five and one-half page warrant issued out of the grand jury and signed by Judge Ferguson, which was introduced in evidence, sets forth the entire issue in the case of People v. Ryan, et al., and makes clear what the charges consisted of. The warrant showed that it was material to establish Inspector Watkins' connection with a conspiracy to permit gambling, et cetera. It stated that the inquiry was conducted in accordance with 3 Comp. Laws 1929, §§ 17217, 17218 (Stat. Ann. §§ 28.943, 28.944); that it was for the purpose of "investigation into gambling and matters in connection therewith in the county of Wayne;" that the investigation was assigned to the judge who acted as a one-man grand-jury; that there was probable cause to suspect the conspiracy, et cetera. The grand-jury warrant took the place of an indictment, which under the code of criminal procedure, 3 Comp. Laws 1929, § 17118 (Stat. Ann. § 28.843), includes the words information, presentment, complaint, warrant and any other formal written accusation.

Defendant claimed the issuance of the warrant was in violation of the provisions of article 2, § 10,

of the Constitution of the State of Michigan. This refers entirely to unlawful searches and seizures. It has nothing to do with the procedure in the instant case.

We do not believe that the other questions raised by appellant merit discussion.

The judgment of conviction is affirmed.

Boyles, C. J., and Chandler, North, Starr, Wiest, Bushnell, and Sharpe, JJ., concurred.