PEOPLE v RAMOS

Docket No. 76612. Argued October 9, 1986 (Calendar No. 19). Decided
    June 7, 1988.

Joel Ramos was convicted by a jury in the Shiawassee Circuit
    Court, Peter J. Marutiak, J., of welfare fraud and perjury on
    the basis of his failure to report ownership of a commercial
    tractor on an application for assistance under the Social Wel-
    fare Act. The Court of Appeals, R. B. Burns, P.J., and Bronson
    and Hobson, JJ., affirmed in an unpublished opinion per cu-
    riam (Docket No. 74409). The defendant appeals.

In an opinion by Justice Levin, joined by Chief Justice Riley
    and Justices Brickley, Cavanagh, and Archer, the Supreme
    Court held:

Because administration of an oath is an element of perjury
    and no oath was administered to the defendant at the time he
    signed the application for welfare benefits, his conviction of
    perjury must be reversed.

1. The making of an oath is an element of perjury. Under
    Michigan law, the form of an oath sufficient to provide the
    basis for a perjury conviction requires more than a signature
    following a warning of the penalty of perjury. As prescribed by
    statute, in all cases in which oaths may be administered, oaths
    take the form of significant and readily observable acts that
    serve to impress upon the oath taker the importance of provid-
    ing accurate information, and operate as objective evidence
    that the oath taker understands the importance of providing
    accurate information and is promising, under threat of severe
    penalties for lying, to be truthful. The Revised Judicature Act
    provides for the oral administration and acknowledgment of an
    oath, coupled with the oath taker's raising of the right hand.

2. The signing of the application for welfare benefits in this
    case did not constitute the making of an oath. The statutory
    form of oath is designed to be sufficiently distinct so that it is
    recognizable by the oath taker and any observers as a clear

REFERENCES
Am Jur 2d, Welfare Laws §§ 111-113.
See the Index to Annotations under Poor Persons.

acknowledgment of an assumption of responsibility to provide truthful information. The signing of one's name, even to applications for welfare benefits, following a warning on the application of the penalty for perjury, is commonplace and insufficient to constitute perjury.

3. Because the failure to administer an oath to the defendant is dispositive, it is not necessary to address the question whether the Social Welfare Act authorizes administration of oaths.

Affirmed in part, reversed in part, and remanded.

Justice BOYLE, dissenting, stated that wilfully false statements made in an extrajudicial setting in which an oath or affirmation is required are subject to the penalties of perjury. The Penal Code authorizes punishment for extrajudicial false swearing, and § 25 of the Social Welfare Act indicates that the signing of an application for welfare assistance under the penalties of perjury was intended as a substitute for the administration of an actual oath. The plain language of § 25 of the act authorizes criminal liability in perjury for false statements and omissions. Perjury requires only the making of a wilful false statement, material to the issue being considered; welfare fraud requires the making of a false statement which is intended to or actually results in the reception of benefits in excess of those to which an applicant is entitled.

Justice GRIFFIN took no part in the decision of this case.

PERJURY — WELFARE APPLICATIONS — WRITTEN DECLARATIONS.

The making of an oath in the form prescribed under Michigan law is an element of perjury; the mere signing of an application for welfare benefits following a warning on the application of the penalty for perjury is insufficient to constitute perjury (MCL 600.1432; MSA 27A.1432).

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *David E. McClernan,* Prosecuting Attorney, and *Thomas C. Johnson,* Assistant Attorney General, for the plaintiff.

State Appellate Defender (by *James Krogsrud*) for the defendant.

LEVIN, J. *(for reversal).* Joel Ramos was con-

victed of welfare fraud[1] and perjury[2] for filing a
false application for aid to dependent children
(ADC) assistance.[3] Ramos was sentenced to prison
terms of two to four years for the welfare fraud
and ten to fifteen years for the perjury.

---

[1]    Any person who by means of wilful false statement or
representation or by impersonation or other fraudulent device
obtains or attempts to obtain, or aids or abets any person to
obtain (a) assistance or relief to which he is not entitled; or (b)
a larger amount of assistance or relief than that to which he is
justly entitled; or any officer or employee of a county, city or
district department of social welfare who authorizes or recom-
mends relief to persons known to him to be ineligible or to
have fraudulently created their eligibility; or any person who
knowingly buys or aids or abets in buying or in disposal of the
property of a person receiving assistance or relief without the
consent of the director or supervisor of the state department,
shall, if the amount involved shall be of the value of $500.00 or
less, be deemed guilty of a misdemeanor, and shall, if the
amount involved shall be of the value of more than $500.00, be
deemed guilty of a felony, and upon conviction shall be pun-
ished as provided by the laws of this state. The amount in-
volved as used in this subsection shall be defined as the differ-
ence between the lawful amount of assistance or aid and the
amount of assistance or aid actually received. If anyone re-
ceives assistance or relief through means enumerated in this
section, in which prosecution is deemed unnecessary, the state
department or county departments may take the necessary
steps to recover from the recipient the amount involved, plus
interest at 5% per annum. On conviction of the violation of the
provisions of this section of any officer or employee of any
county, city or district department of social welfare, such officer
or employee shall be removed or dismissed from office. [MCL
400.60(1); MSA 16.460(1).]

[2]    Any person authorized by any statute of this state to take
an oath, or any person of whom an oath shall be required by
law, who shall wilfully swear falsely, in regard to any matter
or thing, respecting which such oath is authorized or required,
shall be guilty of perjury, a felony, punishable by imprisonment
in the state prison not more than fifteen [15] years. [MCL
750.423; MSA 28.665.]

A separate statute specifically punishes perjury committed in
courts. MCL 750.422; MSA 28.664.

[3] Ramos failed to report ownership of a commercial tractor. The
sentences run concurrently.

Ramos asserts two grounds for reversing his perjury conviction. First, that the Social Welfare Act[4] does not authorize administration of an oath —an element of perjury—to ADC applicants. Second, that the requisite oath was not administered.

We hold that because administration of an oath is an element of perjury, and an oath was not administered to Ramos when he signed the application, his perjury conviction must be reversed. We therefore do not reach the question whether the Social Welfare Act authorizes the administration of an oath. We affirm the welfare fraud conviction.

I

Dealisa Husted, a Department of Social Services assistance payments caseworker, testified that she reviewed Ramos' application during an interview with Ramos on October 29, 1980. Ramos had followed DSS instructions and completed the application before the interview. Husted checked over the application with Ramos, witnessed his signature, and signed her name to indicate that she had conducted the review.

The application contained an "affidavit"[5] stating that the intentional omission of information or the providing of false information could result in pros-

[4] MCL 400.1 *et seq.;* MSA 16.401 *et seq.* The act governs ADC applications.

[5] The affidavit provided:

I swear or affirm that I have answered all questions on this form as completely as I was able and that all the information that I have written on this form or told to a caseworker is true. I also know that I may be asked to show proof of any information I have given. I also know that if I have intentionally left any information out or if I have given false information, I can be prosecuted for fraud or perjury.

ecution for fraud or perjury. Husted acknowledged that she neither read this affidavit to Ramos nor administered an oath to him.

Following Ramos' conviction of welfare fraud and perjury, the Court of Appeals affirmed in an unpublished per curiam opinion.

II

We agree with Ramos' contention that his signing of the application does not constitute the making of an oath.

Oaths take the form of a significant and readily observable act or acts that serve to impress upon the oath taker the importance of providing accurate information, and operate as objective evidence that the oath taker understands the importance of providing accurate information and is promising, under threat of severe penalties for lying, to be truthful.[6]

The making of an oath is an element of perjury.[7] Under Michigan law, the form of an "oath" sufficient to constitute the basis for a perjury conviction requires more than a signature following a warning of the penalty of perjury. Section 1432 of the Revised Judicature Act sets forth the mode of administering oaths and provides for the oral administration and acknowledgment of the oath, coupled with the oath taker's raising of the right hand:

The usual mode of administering oaths now

---

[6] See *June v School Dist No 11,* 283 Mich 533, 537; 278 NW 676 (1938) (" 'Oath. An external pledge or asseveration, made in verification of statements made, or to be made, coupled with an appeal to a sacred or venerated object, in evidence of the serious and reverent state of mind of the party, or with an invocation to a supreme being to witness the words of the party, and to visit him with punishment if they be false.' ").

[7] See n 2.

practiced in this state, by the person who swears holding up the right hand, shall be observed *in all cases* in which an oath may be administered by law except in the cases herein otherwise provided. The oath should commence, "You do solemnly swear or affirm." [MCL 600.1432; MSA 27A.1432.][8] [Emphasis supplied.]

RJA, § 1432 was applied by this Court in *People v Mankin,* 225 Mich 246; 196 NW 426 (1923), where Mankin was convicted of perjury for making a false statement in an affidavit for a marriage license. Mankin claimed on appeal that his conviction should be reversed because he was not administered the "usual oath"—the words "so help you God" were omitted. While the Court rejected Mankin's claim, it recognized that the statute was applicable and requires some form of oral admonishment, which the oath taker receives and acknowledges with an upraised right hand:

It will be observed that this statute [MCL 600.1432; MSA 27A.1432] does not require any particular form for an oath; it provides only that the party shall swear holding up the right hand. . . . We have come to regard the uplifted hand accompanied by solemn swearing as an appeal to God for the truth of what the witness is about to testify. The words "You do solemnly swear" in and of themselves import a serious appeal to God. When *addressed to* the taker of an oath, who stands with uplifted hand, they signify that he is bound in conscience to tell the truth. Nothing further is necessary. [Emphasis supplied. *Mankin, supra,* p 252.]

---

[8] The phrase "except in the cases herein otherwise provided" refers to the scenarios described in the provisions directly following. Persons "conscientiously opposed" to taking an oath may instead "solemnly and sincerely affirm," MCL 600.1434; MSA 27A.1434; guardians may make oaths on behalf of mental incompetents, MCL 600.1438; MSA 27A.1438; and military personnel may be administered oaths by "any commissioned officer in active service," MCL 600.1440; MSA 27A.1440.

RJA, § 1432 was applied by the Court of Appeals in *Dawson v Secretary of State,* 44 Mich App 390; 205 NW2d 299 (1973). Dawson was arrested for drunken driving and refused to take a breath test. The arresting officer filed a report noting this refusal with the Department of State, which suspended Dawson's driver's license for ninety days. The statute[9] required that the reports be "sworn." Dawson appealed the suspension on the basis that, even though the officer had signed the report, he had not "sworn" to it—he had not raised his right hand and orally sworn.

The Court of Appeals agreed with Dawson's contention, holding that to constitute an "oath," the oath taker must raise the right hand and orally swear. "[T]he statutes involved herein clearly and unequivocally require the police officer's report to be sworn."[10] Because the officer did not fulfill the statutory requirement of raising his right hand and swearing to the report, the report had not been sworn, and the subsequent license suspension was invalid.

The United States District Court for the Western District of Michigan applied RJA, § 1432 to invalidate a chattel mortgage. *In re Bennett,* 223 F Supp 423, 427 (WD Mich, 1963). The statute providing for chattel mortgages required that they contain an affidavit.[11] While the chattel mortgage at issue in *Bennett* contained a notarized affidavit, signed by Bennett, stating that he had been sworn, he had not orally acknowledged, with upraised right hand, an orally administered oath. The affidavit was therefore invalid:

It is clear that under the State law Peterson, the

---

[9] MCL 257.625d-257.625e; MSA 9.2325(4)-9.2325(5).

[10] *Dawson, supra,* p 391.

[11] 1948 CL 566.140 as amended by 1961 PA 106.

> notary public, was required to administer an oath
> to Bennett, the mortgagor, who executed the good-
> faith affidavit attached to the chattel mortgage,
> but examination of the testimony of the notary
> clearly shows that he did not administer any oath
> to the mortgagor. He merely signed the affidavit as
> a notary public to attest the mortgagor's signa-
> ture. [*Id.*]

Bennett's signature and the notary's attestation of
the signature were insufficient to constitute an
"oath."

The State Bar of Michigan committee on the
revision of the criminal code agreed that an
"oath," as presently statutorily defined, requires
more than a simple signature, even if the signa-
ture is made "under the penalties of perjury." As
noted in *People v Kasparis,* 107 Mich App 294,
300; 309 NW2d 241 (1981), "the drafters of the
proposed criminal code were of the opinion that
the terms 'oath' or 'false swearing' as presently
used in the general perjury statute do not include
statements made on official forms bearing notice
that answers are made under the penalties of
perjury."[12]

In affirming Ramos' perjury conviction, the
Court of Appeals relied on *People v Lumbard,* 94
Mich App 16, 18; 287 NW2d 354 (1979), where the
Court of Appeals had earlier held that an ADC
applicant, by "intentionally fil[ing] an untruthful
application for welfare assistance," had committed

---

[12] In *Kasparis* the Court, while not relying on the RJA, held that a
signature alone was not sufficient to constitute a "swearing." Kas-
paris filed a false sales tax return. The form stated that the signer
certified his statements "under penalties of perjury." Relying on the
State Bar committee report noted above, and on *Escobar v United
States,* 388 F2d 661 (CA 5, 1967), where the court held that as a
matter of federal law the signer of a federal tax return that included
the language "under penalties of perjury" could not be convicted of
perjury, the Court of Appeals held that Kasparis had not made a
"swearing."

perjury. That decision did not, however, discuss or advert to RJA, § 1432, *Mankin, Dawson,* or *Bennett.*

The statutory form of oath is designed to be sufficiently distinct so that it is recognizable by the oath taker and any observers[13] as a clear acknowledgment of the oath taker's assumption of responsibility for providing truthful information. Signing one's name—to correspondence, checks, credit card receipts—is a frequent and casual act. Signing one's name even to applications to obtain funds—for secured and unsecured loans, credit cards, insurance—is also commonplace. For perjury, a signature following a warning of the penalty of perjury is insufficient. The Legislature requires the administration of a distinctive form of oath.

### III

#### A

The dissenting opinion asserts that because RJA, § 1432, prescribing the form for administering oaths, is included in the Revised *Judicature* Act, it applies only to oaths made in "judicial proceedings."[14] This limitation is not, however, apparent in RJA, § 1432, which in terms applies "in all cases." Further, *Mankin* (affidavit for a marriage license), *Dawson* (report of refusal to take a breath test), and *Bennett* (affidavit for a chattel mortgage), all applied RJA, § 1432 to out-of-court oaths.[15]

---

[13] Such as the judge or jury in a case in which the oath taker is providing testimony, the reader of an application for public assistance where the applicant has sworn under oath that his representations are truthful, or the judge or jury in a proceeding in which the oath taker is charged with perjury.

[14] *Post,* p 581.

[15] Additionally, the RJA contains another oath provision which clearly applies to nonjudicial proceedings:

A number of sections of the Revised Judicature Act govern activity occurring outside "judicial proceedings." The provisions creating and providing for the administration of the State Bar and barring the unauthorized practice of law are included in the RJA.[16] These provisions govern all aspects of the practice of law, not merely those aspects occurring in the context of "judicial proceedings." A nonlawyer is not free to practice law as long as he does so outside of "judicial proceedings."

RJA, § 1412, declaring that the Eastern Orthodox faith is a major faith,[17] RJA, § 1405, governing the rights of third-party beneficiaries in contracts,[18] RJA, ch 52, regarding assignments for the benefit of creditors, and former[19] RJA, ch 54, concerning assignments of accounts receivable, are also not limited to "judicial proceedings."

RJA, § 1432 applies in terms to "*all* cases in which an oath may be administered by law." (Emphasis supplied.) The penalty for violating an oath is the same without regard to whether an oath was made in "judicial proceedings" or in other contexts. One of the primary functions of an oath is to place the oath taker on notice that he violates his oath at the risk of incurring severe penalties. Because the penalties for violation of oaths made in "judicial proceedings" and oaths

Whenever any oath or affidavit is or may be required or authorized by law in any cause, matter, or proceeding, *except oaths to witnesses and jurors in the trial of a cause,* and such other oaths as are or may be required by law to be taken before particular officers, the same may be taken before any justice, judge, or clerk of any court or notary public. [MCL 600.1440(1); MSA 27A.1440(1). Emphasis supplied.]

[16] MCL 600.901 *et seq.;* MSA 27A.901 *et seq.*

[17] MCL 600.1412; MSA 27A.1412.

[18] MCL 600.1405; MSA 27A.1405.

[19] Repealed by 1962 PA 174, which enacted the Uniform Commercial Code, MCL 440.1101 *et seq.;* MSA 19.1101 *et seq.*

made in other contexts are the same, there is no reason to suppose that the Legislature intended the oath taker to receive a less highly distinctive warning in the latter situation than in the former.[20]

The argument made by the dissenting opinion is similar to the argument rejected by this Court in *People v Milton,* 393 Mich 234; 224 NW2d 266 (1974). Milton was arrested and bound over by a district court to circuit court for trial. The chapters creating the district court and providing its jurisdiction were added to the RJA.[21] The act conferred on the district court civil jurisdiction in cases where the amount in controversy did not exceed $3,000, and criminal jurisdiction to try certain misdemeanors and to hold preliminary examinations in felony cases.[22]

Milton asserted that because the RJA was limited to civil matters, inclusion in the RJA of the provision creating the district court's jurisdiction in criminal matters violated the title-object clause, Const 1963, art 4, § 24,[23] and that the resulting unconstitutionality and lack of jurisdiction rendered void the criminal prosecution against him.

Milton relied on *People v Stanley,* 344 Mich 530; 75 NW2d 39 (1956), where this Court had ruled that an amendment to the 1915 Judicature Act, providing that a writ of error to the Supreme Court shall issue as a matter of course following judgment in a criminal case involving the personal

[20] Other jurisdictions with statutes prescribing the form for administering oaths apply them to out-of-court oaths. See *Rogers v People,* 161 Colo 317; 422 P2d 377 (1966); *State v Blaisdell,* 253 A2d 341 (Me, 1969).

[21] 1968 PA 154; RJA, chs 81-83.

[22] The $3,000 ceiling has since been increased to $10,000. 1971 PA 148, MCL 600.8301; MSA 27A.8301. The district court's criminal jurisdiction is set forth in MCL 600.8311; MSA 27A.8311.

[23] "No law shall embrace more than one object, which shall be expressed in its title."

liberty of the appellant, violated the title-object clause.[24] This Court rejected Milton's arguments and overruled *Stanley*.

B

The dissenting opinion also asserts that the phrase "under the penalties of perjury" in the Social Welfare Act serves as both statutory authorization for the administration of an oath and as an "oath" in itself.[25]

In some jurisdictions, a signature following the phrase "under the penalties of perjury" may indeed provide sufficient basis for a criminal prosecution. It appears that in those jurisdictions, however, the legislature has specifically deemed that falsely signing under such language may be penalized. For example, 26 USC 7206, setting forth the crimes of fraud and false statements, explicitly deems the making of a false statement a felony:

[24] The title of the 1915 Judicature Act (1915 PA 314) and of the RJA (1961 PA 236) were identical in all material respects.

[25] *Post*, pp 576-577. MCL 400.25; MSA 16.425 provides:

> An applicant for assistance or a third party acting responsibly in his behalf shall deliver his application in writing to the county department of social services in the manner and form prescribed by the state department. All statements in the application shall be over the signature or witnessed mark of the applicant or such third party and shall include a declaration *under the penalties of perjury* that the application has been examined by or read to the applicant or third party, and, to the best of the applicant's or third party's knowledge, that all facts are true in each material point and are complete; and the applicant or third party shall empower the county department of social services and the state department to obtain all necessary information concerning the recipient of social services for whom the application is made and his resources in order to determine the eligibility of the applicant. No question, inquiry or recommendation shall relate to the political opinions or religious affiliations of any person, and no grant or denial of aid under this act shall be in any manner affected or influenced by such opinions or affiliations. [Emphasis supplied.]

Any person who . . . [w]illfully *makes and sub-scribes* any return, statement, or other document, *which contains or is verified by a written declaration that it is made under the penalties of perjury,* and which he does not believe to be true and correct as to every material matter . . . *shall be guilty of a felony* . . . . [Emphasis supplied.]

Statutes in California, Washington, and Wyoming similarly have provided that a person who falsely signs his name to forms stating that they are signed "under the penalties of perjury" is guilty of an offense.[26] Just as the federal statute

---

[26] Section 118 of the California Penal Code provides:

Every person who, having taken an oath that he will testify, declare, depose, or certify truly before any competent tribunal, officer, or person, in any of the cases in which such an oath may by law of the State of California be administered, wilfully and contrary to such oath, states as true any material matter which he knows to be false, *and* every person who testifies, declares, deposes, or certifies under penalty of perjury in any of the cases in which such testimony, declarations, depositions, or certification is permitted by law of the State of California under penalty of perjury and wilfully states as true any material matter which he knows to be false, is guilty of perjury. [Emphasis supplied.]

Section 74.08.055 of the Revised Code of Washington provides:

Each applicant for or recipient of public assistance shall make an application for assistance which shall contain or be verified by a written declaration that it is made under the penalties of perjury. The secretary, by rule and regulation, may require that any other forms filled out by applicants or recipients of public assistance shall contain or be verified by a written declaration that it is made under the penalties of perjury *and such declaration shall be in lieu of any oath otherwise required, and each applicant shall be so informed at the time of the signing.*

Any applicant for or recipient of public assistance who wilfully makes and subscribes any application, statement or other paper which contains or is verified by a written declaration that it is made under the penalties of perjury and which he does not believe to be true and correct as to every material matter shall be guilty of a felony. [Emphasis supplied.]

states that a person who falsely signs under the penalties of perjury "shall be guilty of a felony," the California statute provides that a person who so falsely signs "is guilty of perjury," and the Washington statute provides "shall be guilty of a felony," and the Wyoming statute provided "shall be guilty of false swearing."[27]

Our Legislature has not provided that a person signing an application stating that the applicant signs under the penalties of perjury "is guilty of perjury." It provided only that the application for welfare assistance shall be "under the penalties of perjury."[28] Because the Legislature did not specify

---

Section 6-8-102 of the Wyoming Code formerly provided:

> *False swearing other than in judicial or administrative proceeding; false claim or voucher.*
> Whoever, under oath or affirmation lawfully administered in any matter where an oath is authorized by law to be taken, shall willfully, corruptly and falsely make any false certificate, affidavit, acknowledgment, declaration or statement of any nature other than in a judicial or administrative proceeding, *or whoever submits a false claim or voucher under penalty of perjury,* shall be guilty of false swearing, and upon conviction shall be imprisoned in the penitentiary not more than five (5) years. [Emphasis supplied.]

This provision has since been replaced by § 6-5-303, which provides:

> (a) A person commits a felony punishable by imprisonment for not more than two (2) years, a fine of not more than two thousand dollars ($2,000.00), or both, if, while under a lawfully administered oath or affirmation in a matter where an oath is authorized by law, he knowingly makes a false certificate, affidavit, acknowledgment, declaration or statement other than in a judicial or administrative proceeding.
> (b) A person is guilty of a felony punishable by imprisonment for not more than two (2) years, a fine of not more than two thousand dollars ($2,000.00), or both, if he knowingly submits a false claim or voucher with intent to defraud.

[27] *Id.*

[28] The drafters of the "affidavit" signed by Ramos did not proceed on the basis that including the words "under the penalties of perjury" in the application would alone constitute the administration of an oath. The "affidavit" in the application begins "I swear or affirm . . . ." See n 5. Indeed the phrase "under the penalties of

that a person who falsely signs an application under the penalties of perjury "is guilty of perjury," it did not substitute such signing for the form of oath required by RJA, § 1432.[29]

The statutorily prescribed form of oath remains an element of the offense of perjury. It will remain an element until the Legislature in terms dispenses with the oath by specifying the mere false signing of an application, stating that the signing is under the penalties of perjury, constitutes the offense of perjury.[30]

perjury" was not incorporated in the "affidavit" in Ramos' ADC application. *Id.* The affidavit did indeed say "I can be prosecuted for fraud or perjury," but nevertheless did not in terms "include a declaration under the penalties of perjury."

[29] The perjury warning required by § 25 of the Social Welfare Act places the applicant on notice that a perjury prosecution may result from a false signing. Ramos, had he been administered a proper oath, might have been prosecuted for perjury. See, however, n 28.

[30] Perkins & Boyce do not state that "the phrase [under the penalties of perjury] is the legally recognized equivalent of an oath." *Post,* p 576. Perkins & Boyce state rather that signing a form "under the penalties of perjury" is equivalent to an oath where so deemed by the Legislature.

> Recently an additional substitute for an oath has made its appearance, this one being provided for the convenience of the declarant. It is by virtue of legislation providing for certain signed statements (such as the declaration of an income tax return) to be made expressly "under the penalties of perjury." The quoted words are a part of the signed declaration, and the statute provides the same penalties as for perjury if the signer does not believe the statement to be true and correct as to every material matter. [Perkins & Boyce, Criminal Law (3d ed), p 513.]

The authority cited in support of this statement is *Dickinson v Wainwright,* 626 F2d 1184 (CA 5, 1980), *Cohen v United States,* 201 F2d 386 (CA 9, 1953), 26 USC 7206, and *Nimmo v Wyoming,* 603 P2d 386 (Wy, 1979).

*Dickinson* discusses 18 USC 1621 (quoted *post,* pp 583-584), which provides that whoever makes an intentional false "statement under penalty of perjury . . . is guilty of perjury."

*Cohen* discusses 26 USC 3809, the predecessor of 26 USC 7206 (quoted in text preceding n 26), both of which similarly specifically provide that a person signing "under the penalties of perjury . . . shall be guilty of a felony."

*Nimmo* discusses the Wyoming statute (set forth in n 26), which also provides that whoever submits a false claim "under penalty of perjury, shall be guilty of false swearing . . . ."

The statement in Perkins & Boyce must be read in connection with, and limited by, the authority cited in support of that statement. Since that authority concerns only statutes specifically providing that whoever signs under the penalties of perjury "is guilty of perjury," or "shall be guilty of a felony," or "shall be guilty of false swearing," the Perkins & Boyce quotation does not support the conclusion that a statute merely providing for a declaration "under the penalties of perjury," but not specifying that such a false declaration "is . . . perjury," or "shall be . . . false swearing," substitutes for the oath specified in RJA, § 1432.

The dissenting opinion also offers six cases to support its contention that "[t]he broad sense of the word ['oath'] has often been held to include the signing of a statement 'under the penalties of perjury.' " *Post,* p 576. None of the cases support this contention. Rather, the statutes cited in several of the cases indicate that where legislatures intend to penalize the false signing of an application containing notice that it is signed "under the penalties of perjury," they do so explicitly.

In *American Civil Liberties Union v Los Angeles Bd of Ed,* 59 Cal 2d 203, 217; 28 Cal Rptr 700; 379 P2d 4 (1963), cert den 375 US 823 (1963), a school required groups wishing to use school grounds to file a statement that the grounds would not be used for the "commission of any act that is prohibited by law . . . ." The ACLU challenged the requirement, contending inter alia that it violated constitutional guarantees of due process and free speech, subverted the presumption of innocence, and was arbitrary, unreasonable, vague, and overbroad. (The court upheld the requirement.) The only mention of perjury was made in discussing the ACLU's contention that the school's requirement subverted the presumption of innocence and inverted the burden of proof:

> Nor can we find—as petitioners contend—any unconstitutional limitation in the fact that the rule requires an applicant to make the statement therein set forth under penalty of perjury. The oath is but the vehicle by which information (constitutional or unconstitutional) is sought. It is the right to demand the particular information that is at issue, and not the form in which it is requested. Frequently an applicant for governmental benefits is required to give information under oath. This is so because the verified information is more apt to be complete and correct. If the information sought by respondent is unassailable, then the form in which it is required is of no moment. [*American Civil Liberties Union, supra,* p 217.]

While the opinion apparently uses the term "oath" here as shorthand for the phrase "under penalty of perjury," this usage does not constitute a "holding." Nowhere does the opinion discuss whether a statement made "under the penalties of perjury" suffices as an "oath" for purposes of a perjury statute requiring administration of an oath.

In *People v Laws,* 120 Cal App 3d 1022, 1031; 178 Cal Rptr 102 (1981), defendant Laws had previously been convicted of a separate crime and, as a condition for receiving probation, agreed to pay $27,000 in restitution. He failed to pay the money, but filed a declaration with the court claiming that he had paid. Laws was convicted of perjury and preparing false documentary evidence. Among the challenges Laws raised to his convictions was his claim that the declaration on which the charges were based was not legally sufficient to support the charges. Laws claimed that because the declaration he filed did not contain an " 'averment . . . that the same is true and correct,' " he could not be convicted of perjury. (The court upheld the convictions.)

Again, there was no discussion of whether the making of a statement "under the penalties of perjury" is equivalent to making a statement under oath. The California perjury statute cited in the opinion, in fact, clearly distinguished between statements made "under oath" and those made "under the penalties of perjury":

> Penal Code section 118 provides: "Every person who, having taken an oath that he will testify, declare, depose, or certify truly before any competent tribunal, officer, or person, in any of the cases in which such an oath may by law be administered, wilfully and contrary to such oath, states as true any material matter *which he knows to be false, and* every person who testifies, declares, deposes, or certifies under penalty of perjury in any of the cases in which such testimony, declarations, depositions, or certification is permitted by law under penalty of perjury and wilfully states as true any material matter which he knows to be false, is guilty of perjury." [Emphasis supplied. *Laws, supra,* p 1030.]

Unlike Michigan's perjury statute, the California statute clearly encompassed persons who "certif[y] under penalty of perjury . . . ." If Michigan had a statute like the California statute, Ramos need not have been administered an oath to have been convicted. Simply signing the statement "under penalty of perjury" would have been sufficient.

*People v Doss,* 99 Ill App 3d 1026; 55 Ill Dec 349; 426 NE2d 324 (1981), concerned the adequacy of an indictment alleging perjury and filing a wilful and fraudulent tax return where the accused had prepared the form but was not the taxpayer. The opinion focused on whether a tax preparer was required by law to sign the returns he prepared. (The court upheld the trial court's dismissal of the indictment.) Whether the signing of a document "under penalties of perjury" is equivalent to the making of a statement under oath was a question neither presented to nor addressed by the court.

*Valdez v State,* 300 Md 160; 476 A2d 1162 (1984), concerned the validity of affidavits supporting a search warrant. Maryland statutorily defined an affidavit as " 'an oath that the matters and facts set forth in the paper writing to which it pertains are true to the best of the affiant's knowledge, information and belief.' " The statute then

defined "oath" as " 'a declaration or affirmation made under penalties of perjury, that a certain statement of fact is true.' " *Id.,* p 167, quoting Maryland Rules of Procedure, Rule 5(c). (The court held that under the facts of the case, the offered affidavits met the statutory requirements and were valid.)

While here "oath" was statutorily defined as "a declaration or affirmation made under penalties of perjury," this meaning of the term "oath" is clearly limited to this particular Maryland rule, setting forth the requirements for valid affidavits. The question raised by *Ramos*—whether the signing of a statement "under the penalties of perjury" was sufficient to satisfy the separate requirement of a perjury statute that an oath be administered—was not addressed by the court.

In *State v Bailey,* 14 Wash App 748; 544 P2d 778 (1976), defendant Bailey challenged the constitutionality of the welfare fraud statute under which he was convicted. Bailey, like Ramos, had obtained public assistance to which he was not entitled by means of a false statement. Unlike Ramos, however, Bailey was convicted only of welfare fraud, not also of perjury. Contrary to the assertion in the dissenting opinion, the *Bailey* court did not hold that, or even discuss whether, the "broad sense" of the word "oath" includes the signing of a statement "under penalties of perjury." In fact, while Bailey was not charged with perjury, the equivalent Washington statute, unlike the statute in *Ramos,* clearly covered his conduct:

> *"Verification of Applications—Penalty.* Each applicant for or recipient of public assistance shall make an application for assistance which shall contain or be verified by a written declaration that it is made under the penalties of perjury. The director, by rule and regulation, may require that any other forms filled out by applicants or recipients of public assistance shall contain or be verified by a written declaration that it is made under the penalties of perjury *and such declaration shall be in lieu of any oath otherwise required, and each applicant shall be so informed at the time of the signing.*
>
> "Any applicant for or recipient of public assistance who wilfully makes and subscribes any application, statement or other paper which contains or is verified by a written declaration that it is made under the penalties of perjury and which he does not believe to be true and correct as to every material matter shall be guilty of a felony." [Emphasis supplied. *Id.,* p 751, n 3, quoting Wash Rev Code 74.08.055, as enacted, Laws of 1959, ch 26, § 74.08.055, p 142.]

In *Nimmo v Wyoming, supra,* defendant Nimmo challenged his convictions of false swearing. The question presented was not whether the term "oath" included the signing of a statement "under the penalties of perjury," but rather whether the false swearing statute incorporated the requisite mens rea element. Furthermore, unlike the perjury statute at issue in *Ramos,* the false swearing statute under which Nimmo was convicted would clearly encompass the filing, "under penalty of perjury," of a false application:

IV

Many courts concur that a signature alone is insufficient to constitute an "oath."[31] In *Spangler v Dist Court,* 104 Utah 584, 590; 140 P2d 755 (1943), Spangler challenged the validity of the complaint that formed the basis for his conviction. The relevant statute required complaints to be sworn to "under oath." The police officer filing the complaint—which contained the language " 'who on being duly sworn by me, on his oath did say . . . ' "—signed it in the presence of a justice of the peace, but neither received an oral admonishment nor made an oral acknowledgment.

"§ 6-8-102. *False swearing other than in judicial or administrative proceeding; false claim or voucher.*

"Whoever, under oath or affirmation lawfully administered in any matter where an oath is authorized by law to be taken, shall willfully, corruptly and falsely make any false certificate, affidavit, acknowledgment, declaration or statement of any nature other than in a judicial or administrative proceeding, *or whoever submits a false claim or voucher under penalty of perjury,* shall be guilty of false swearing, and upon conviction shall be imprisoned in the penitentiary not more than five (5) years." [*Id.,* p 388, quoting (Laws 1971, ch 71, § 1) (emphasis supplied).]

In summary, none of the cases cited by the dissenting opinion support its assertion. The question whether the term "oath" could be interpreted to mean signed "under the penalties of perjury" was neither raised nor addressed, and many of the cases involve statutory schemes substantially different from that at issue here.

The perjury and false swearing statutes cited in these opinions highlight that legislatures recognize a distinction between statements made under oath and those made "under the penalties of perjury." See *Laws, Bailey,* and *Nimmo, supra.* Legislatures that wish to punish the making of false statements "under the penalties of perjury" explicitly provide for such a penalty.

[31] See *Rogers v People,* n 20 *supra; State v Blaisdell,* n 20 *supra; State v Privitt,* 327 Mo 1194; 39 SW2d 755 (1931); *White v State,* 102 Nev 153; 717 P2d 45 (1986); *People v O'Reilly,* 86 NY 154; 40 Am Rep 525 (1881); *People v Lieberman,* 57 Misc 2d 1070; 294 NYS2d 117 (1968); *Youngstown Steel Door Co v Kosydar,* 33 Ohio App 2d 277; 294 NE2d 676 (1973); *Lowry v State,* 164 Tex Crim 178; 297 SW2d 848 (1956); *Komp v State,* 129 Wis 20; 108 NW 46 (1906). See, generally, anno: *Formalities of administering or making oath,* 51 ALR 840.

Utah has no statute prescribing the form of an oath. A Utah statute provides rather that "[i]t is no defense to a prosecution for perjury that the oath was administered or taken in an irregular manner."[32] Yet the Supreme Court of Utah held that the officer's signature alone was insufficient to constitute an oath. A signature was not a sufficiently distinctive act to serve as an oath:

> We believe the correct interpretation of the law to be that there must be some outward formality, some manifestation of the intention to place the affiant under the penalty and obligation of an oath. There must be definite evidence that affiant was conscious that he was taking an oath; that is there must be not only the consciousness of affiant that he was taking an oath, but there must be some outward act from which that consciousness can be definitely inferred. That cannot be done from the mere signature to a printed form of oath. . . .
> We therefore hold that the mere appearing before the justice and signing a criminal complaint does not constitute swearing to it . . . . [*Id.,* pp 591-592.][33]

The Georgia Supreme Court, in *Britt v Davis,* 130 Ga 74, 77-79; 60 SE 180 (1908), similarly held that a signature alone does not constitute an "oath." *Britt* concerned the validity of a distress warrant forming the basis for a property seizure for overdue rent. The relevant statute required that the request for the warrant be verified by an

---

[32] Utah Code Ann 1943, 103-43-4.

[33] The Utah Supreme Court in *Colman v Schwendiman,* 680 P2d 29 (1984), recently confirmed its opinion in *Spangler. Colman* concerned the validity of a police report forming the basis for suspension of Colman's driver's license. The relevant statute required the officer to swear to the report. Utah Code Ann 1953, 41-6-44.10. The officer signed the report in the presence of a notary. The court held that a signature alone was insufficient to constitute an oath. Oaths "require a formal verbal affirmation . . . ." *Id.,* p 31.

oath.[34] Davis, the complainant, filed a notarized affidavit, but did not receive an oral admonishment or make a verbal affirmation.[35] The court held that a signature alone was insufficient to distinguish sworn statements from those that are unsworn. "Whether the affiant testifies in view of his responsibility to God or only to the criminal law, in either event what he does is something more than merely to sign a paper." *Id.*, p 77.

The court concluded by noting that because the issuance of a distress warrant carries serious consequences, it is important that there be no doubt that the complainant requested the warrant under oath:

We can not but deprecate the tendency to treat the taking of an oath as a mere technical formality, worthy of little attention. In the strenuous age in which we live speed is deemed of prime importance. But one must still pause long enough to verify the statements contained in a paper prepared for use as an affidavit, by swearing to them, before he can obtain a distress warrant to be issued and have the property of another seized. [*Id.*, pp 78-79.][36]

[34] Ga Civ Code 1895, 4818.

[35] As in *Spangler,* there was no statute prescribing a particular form for oaths.

[36] The Georgia Court of Appeals in *Gruber v Fulton Co,* 111 Ga App 71; 140 SE2d 552 (1965), applied *Britt. Gruber* presented the question whether a tax return had been sworn to where it was signed but no oral oath was administered. Citing *Britt* and numerous other authorities, the court held that the signature alone was insufficient.

While a number of jurisdictions have held that a verbal admonishment is not necessary to constitute an "oath," these jurisdictions either did not have a statute prescribing the form for administering oaths, *United States v Troutman,* 814 F2d 1428 (CA 10, 1987); *Anchorage Sand & Gravel Co, Inc v Wooldridge,* 619 P2d 1014 (Alas, 1980); *People v Walker,* 247 Cal App 2d 554; 55 Cal Rptr 726 (1967); *State v Parker,* 81 Idaho 51; 336 P2d 318 (1959); *Dalbey Bros Lumber Co v Crispin,* 234 Iowa 151; 12 NW2d 277 (1943); *State v Snyder,* 304 So 2d 334 (La, 1974); *Plauche-Locke Securities, Inc v Johnson,* 187 So 2d 178 (La App, 1966); *State v Madigan,* 57 Minn 425; 59 NW 490

V

Because the failure to administer an oath to Ramos is dispositive of this appeal, we do not address Ramos' contention that the Social Welfare Act does not authorize the administration of oaths.[37]

As to Ramos' remaining issues, our disposition

(1894); *Atwood v State,* 146 Miss 662; 111 So 865; 51 ALR 836 (1927); *Moore v Peterson,* 218 Neb 615; 358 NW2d 193 (1984); *Lebak v Freck,* 212 NJ Super 234; 514 A2d 856 (1986); *Cincinnati Finance Co v First Discount Corp,* 59 Ohio App 131; 17 NE2d 383 (1938); *Cole v State,* 92 Okla Crim 316; 223 P2d 155 (1950); *State v Holladay,* 120 SC 154; 112 SE 827 (1922); *State v Lewis,* 85 Wash 2d 769; 539 P2d 677 (1975), or had statutes that were not mandatory, *In re Rice,* 35 Ill App 2d 79; 181 NE2d 742 (1962); *Blackburn v Motor Vehicles Div,* 33 Or App 397; 576 P2d 1267 (1978).

Furthermore, in *each of the cases cited above, the signature of the "oath" taker was notarized or witnessed by a notary public, a justice of the peace, or some other official authorized to administer oaths.* There is no evidence that the DSS caseworker before whom Ramos signed his application was such an official. Additionally, a number of these decisions reached their result through applying statutes explicitly stating: It shall be no defense to a prosecution for perjury that an oath was admitted or taken in an irregular manner. *Walker, Parker, Snyder, Blackburn,* and *Lewis, supra.* Finally, in many of these cases, unlike the present case, the "oath" taker was a policeman, attorney, or other person who had had considerable experience in submitting sworn statements and who clearly understood both that a swearing was required and the consequences of swearing falsely. *Troutman, Parker, Atwood, Moore, Cole, Blackburn,* and *Holladay, supra.*

In *State v Anderson,* 178 Kan 322; 285 P2d 1073 (1955), the court disregarded a statute requiring oaths to be administered by placing the right hand on a bible or with an upraised hand, and upheld defendant Anderson's perjury conviction. Anderson was a deputy sheriff and had filed a false criminal complaint. The court noted that Anderson was a deputy sheriff (who presumably understood that complaints were to be sworn to) and that he had signed the complaint before a judge.

*Anderson* stands alone in ignoring a statutory requirement that an oath be administered. And *Anderson* is unlike the present case in that there the "oath" taker clearly understood, through experience, that he was under oath. Additionally, other formalities were observed. Anderson signed the form before a judge, who affixed his official seal.

[37] As originally enacted in 1939, § 25 of the Social Welfare Act provided:

makes it unnecessary to consider his claims that his perjury conviction must be reversed because the trial court refused to make a determination of law regarding whether his failure to report ownership of the tractor was material, or failed to adequately instruct the jury with respect to the element of materiality, or that he must be resentenced because the trial court abused its discretion in imposing a consecutive sentence for the perjury conviction. As to the other remaining issues, we are no longer persuaded that those issues should be reviewed by this Court.

> All statements in the application shall *be sworn to or affirmed by* the applicant setting forth that all facts are true in each material point . . . . [1939 PA 280, § 25. Emphasis supplied.]

The "sworn to or affirmed by" language remained until 1957, when it was replaced by "under the penalties of perjury." 1957 PA 95, § 25. The amended § 25 read in pertinent part as follows (new language emphasized):

> All statements in the application shall be *over the signature or witnessed mark of the applicant and shall include a declaration under the penalties of perjury that the application has been examined by or read to the applicant, and, to the best of the applicant's knowledge,* that all facts are true in each material point . . . .

The amendment requires explicit notice to applicants that submission of fraudulent applications may be prosecuted as perjury, and prescribes the manner in which such notice shall be given. It does not change the elements of perjury by eliminating the requirement that there be an oath. Nor does it eliminate the requirements of RJA, § 1432, prescribing the form of an oath.

It might be argued that the Legislature, by amending the language, intended to by-pass both the statute prescribing the elements of perjury and the statute prescribing the form for administering oaths, so that the signing of a form containing the warning that the signature was "under the penalties of perjury" in itself constitutes an "oath." Such an argument cannot withstand analysis for the reasons discussed in part III. Where legislatures intend to penalize the false signing of documents "under the penalties of perjury," they do so explicitly by stating that a person who so falsely signs "is guilty of perjury," or "shall be guilty of a felony," or "shall be guilty of false swearing." See 26 USC 7206 and statutes quoted in n 26 and discussion in n 30. Section 25 of the Social Welfare Act does not so provide.

We reverse Ramos' perjury conviction, and affirm his welfare fraud conviction.

RILEY, C.J., and BRICKLEY, CAVANAGH, and ARCHER, JJ., concurred with LEVIN, J.

BOYLE, J. (*dissenting*). Joel Ramos was convicted by a jury of perjury predicated on false swearing[1] and welfare fraud[2] in connection with the filing of applications for assistance with the Michigan Department of Social Services.[3] On conviction, the defendant was sentenced to concurrent prison terms of ten to fifteen and two to four years, respectively, on the false swearing and welfare fraud convictions.

Ramos challenges his false swearing conviction on the ground that his false application did not constitute false swearing because no "oath" was taken, and that the trial court erred in submitting the issue of "materiality" to the jury. Ramos also argues that his sentence on the false swearing conviction constitutes an abuse of discretion which should shock the conscience of this Court.

Finding no merit in either of these arguments, I would affirm the defendant's convictions and sentence.

_____

[1] MCL 750.423; MSA 28.665.

[2] MCL 400.60; MSA 16.460. Since the issues raised by defendant regarding this conviction are not addressed in the majority opinion, and since I too find no merit in them, I have not addressed them in this opinion.

[3] Specifically, the defendant was charged with having filed applications for assistance in which he failed to disclose ownership of a farm tractor and front end loader in violation of a statute that precludes the making of a false statement to obtain relief in an amount more than $500, MCL 400.60(1); MSA 16.460(1), and false swearing on a material matter for which an oath is required, MCL 750.423; MSA 28.665.

I

FACTS

On April 2, 1980, October 29, 1980, and January 15, 1981, Ramos completed and signed applications for assistance with the DSS. A portion of each application required the applicant to list any owned motor vehicles. In the 1980 applications, Ramos listed only a 1970 Ford Econoline van valued at $300. In the 1981 application, Ramos again listed the van and one 1976, 250cc motorcycle. The 1981 application specified that the motorcycle was owned by Marilyn Miller. Miller was living with Ramos at the time of these applications. Both Ramos and Miller received DSS assistance during this time period.[4]

On November 9, 1980, Donald Hilton, Jr., a criminal investigator for the DSS, received a complaint that Ramos was seen leaving a doctor's office driving a 1977 Porsche. Hilton's subsequent investigation revealed that the Porsche was registered to Marilyn Miller. Hilton discovered that Miller had not listed the Porsche as an asset in her applications for DSS assistance. He also discovered that Miller was registered as the owner of one Harley Davison 1200cc Low Rider motorcycle which was not listed as a motor vehicle asset on her application for DSS assistance.

Those revelations, together with some unspecified evidence that Miller was not actually the owner of the motorcycle, prompted Hilton to further investigate the complaint. Hilton ultimately learned that Miller and Ramos were the registered owners of one 1980 Kubota tractor, the nondisclosure of which is the subject matter of the instant prosecution.

---

[4] The record indicates that Miller had been receiving assistance for a number of years prior to these applications.

At trial, Robert Kain, an employee of S & W Equipment Company, testified that Ramos and Miller purchased the new tractor for $5,232 on October 9, 1980. The tractor was purchased with a cash deposit of $2,232 and a bank note in the amount of $3,000.

Craig Christopher Faust, the Vice President in charge of Loan Control at Pacesetter Bank & Trust, testified that the bank received an application for a loan from Ramos and Miller on October 9, 1980. A loan in the amount of $3,012 was eventually co-signed by Ramos and Miller for the purpose of purchasing a Kubota tractor.[5] The bank's records did not reveal any encumbrance other than Pacesetter's on the tractor, and there was no indication that the down payment had been borrowed by Ramos and Miller. The records did indicate that Ramos and Miller had a monthly income of $1,000 to $2,000. The records also indicated that no further credit check was undertaken because Miller had an excellent record of payment on several other loans, including one in 1979 for $8,423 on a 1977 Porsche. The loan on the Kubota tractor was uneventfully serviced and finally paid off on April 19, 1982.

Two DSS social workers assisted Ramos in his applications for assistance. Ramos' case was assigned to Lola Verschoor in April of 1980 because she had been previously assigned to Marilyn Miller's case. Verschoor testified that individual cases for members of the same household are normally assigned to the same caseworker to facilitate accuracy in the listing of assets. According to Verschoor, all assets of the household must be listed on each individual application.

Verschoor recalled assisting Ramos in his appli-

---

[5] Faust explained that the additional twelve dollars was for filing fees to secure the tractor.

cation for several reasons. First, Marilyn Miller had been Verschoor's client for a number of years. Miller was with Ramos when he filed his application for assistance. Second, Ramos was wearing a particularly nice pair of boots when he entered his application. Verschoor explained that it is unusual for a DSS client to dress as well as Ramos was during the interview. Third, Verschoor noted that the Ramos-Miller household expenses were extremely high for the amount of a grant allowed by the state.

Verschoor testified that Ramos appeared to understand their conversations and appeared to be fairly literate. According to Verschoor, Ramos signed both the April, 1980, and January, 1981, applications in her presence after being questioned as to the existence of any other assets. Verschoor did not administer an oath nor did she read the application form to Ramos, but she did witness his signature with her own signature. The January, 1981, application form included an affidavit "swearing" that the applicant could be prosecuted for fraud or perjury for omissions or false statements.

Since Verschoor was ill when Ramos filed his October 29, 1980, application, Dealisa Husted, another DSS social worker, conducted the interview. Husted remembered Ramos and also remembered that Marilyn Miller was present during the interview. According to Husted, Ramos spoke with a slight accent, but his sentences were reasonably well constructed, and he appeared to be a fairly literate person. Husted testified that she routinely went through each application page by page to determine whether there were any errors or omissions. She also routinely questioned applicants as to whether they had any assets not listed in the application form. The form signed by Ramos on

October 29, 1980, also contained an affidavit "swearing" that any omission or false statement could result in a prosecution for fraud or perjury. Like Verschoor, Husted did not administer an oath, but merely witnessed Ramos' signature on the application with her own signature.

Ramos' and Miller's assistance was terminated in January of 1981 when the DSS learned of the purchase of the Kubota tractor.[6] Ramos declined to testify in the subsequent criminal proceedings. However, Donald Hilton, Jr., testified that, on January 13, 1981, Ramos told him that he had borrowed the down payment for the tractor from his in-laws and had intended to use it to perform contracting work in order to get off welfare. The prosecution also introduced a statement given by Ramos in his January 15, 1981, administrative appeal of the termination of DSS assistance. In the latter statement, Ramos admitted that he had purchased a motorcycle with a borrowed down payment, but had lost it "to the man" because he could not make the payments. Ramos further asserted that the tractor was solely the property of his in-laws for use on their dairy farm.

As previously noted, Ramos was found guilty in a jury trial of both welfare fraud and perjury predicated on false swearing. The Court of Appeals affirmed both convictions in an unpublished per curiam opinion dated April 9, 1985.

---

[6] According to the social workers' testimony, as well as the testimony of Donald Hilton, Jr., it was the policy of the DSS to limit personal assets to $2,000 for households receiving assistance. See MCL 400.56g; MSA 16.456(7) and the discussion in part B.

## II

### THE PERJURY CONVICTION

A. DOES THE LEGISLATURE INTEND THAT A FALSE STATEMENT IN A DSS ASSISTANCE APPLICATION BE PUNISHABLE AS PERJURY ONLY IF IT IS ACCOMPANIED BY THE TAKING OF AN ACTUAL OATH?

Section 25 of the Social Welfare Act, 1968 PA 232, provides in pertinent part:

An applicant for assistance or a third party acting responsibly in his behalf shall deliver his application in writing to the county department of social services in the manner and form prescribed by the state department. *All statements in the application shall be over the signature or witnessed mark of the applicant or such third party and shall include a declaration under the penalties of perjury that the application has been examined by or read to the applicant or third party, and, to the best of the applicant's or third party's knowledge, that all facts are true in each material point and are complete* . . . . [MCL 400.25; MSA 16.425. Emphasis added.][7]

Although the legal implications of a falsified application would appear to be clear, the Social Welfare Act itself does not prescribe the penalty for this form of perjury, nor does it authorize the administration of an actual oath.

Mr. Ramos was charged, convicted, and sentenced under Michigan's false swearing perjury statute which provides:

Any person authorized by any statute of this state to take an oath, or any person of whom an

---

[7] This language was added to 1945 PA 225, § 25, by 1957 PA 95, § 25, and was reenacted in 1965 PA 401 with minor changes.

oath shall be required by law, who shall wilfully. swear falsely, in regard to any matter or thing, respecting which such oath is authorized or required, shall be guilty of perjury, a felony, punishable by imprisonment in the state prison not more than fifteen [15] years. [MCL 750.423; MSA 28.665.]

The DSS application forms signed by Ramos and upon which his perjury conviction is based contained the following language above the applicant's signature:

I swear or affirm that I have answered all questions on this form as completely as I was able and that all the information that I have written on this form or told to a case worker is true. I also know that I may be asked to show proof of any information I have given. I also know that if I have intentionally left any information out or if I have given false information, I can be prosecuted for fraud or perjury.

Ramos raises two issues of statutory construction regarding his perjury conviction: first, that a perjury prosecution is not authorized by § 25 of the Social Welfare Act, and, second, that no actual oath was authorized or administered to support his conviction.

In my view, § 25 of the Social Welfare Act indicates a legislative intent that an oath *or* affirmation of truthfulness is contemplated by the phrase "under the penalties of perjury," and that the Penal Code penalizes wilfully false statements made in an extrajudicial setting subject to the penalty of perjury.

The examination of these issues requires a review of the historical development of perjury.

At its origins in the ecclesiastical courts, the Star Chamber, and English common law, the offense of perjury was limited to false oaths in

judicial proceedings.[8] However, as one commentator has explained:

> In time, sworn statements came to be required in many matters other than judicial proceedings and with the growing importance of this problem came recognition of the social interest in the integrity of such an oath. Hence the common law provided a penalty for wilful and corrupt false swearing of such a nature, although the name "perjury" was not employed. As said by Lord Denman in such a case: "It is not, properly speaking, perjury because the same consequences do not attach. But it is a misdemeanour in falsely taking an oath which a party is required by Parliament to take before a magistrate." [Perkins & Boyce, Criminal Law (3d ed), p 511.]

Thus, according to Perkins & Boyce, there are two offenses at common law. Perjury is a false oath in a judicial proceeding in regard to a material matter. False swearing is what would be perjury except that it is not in a judicial proceeding, but in some other proceeding or matter in which an oath is required by law. A false oath at common law is a wilful and corrupt sworn statement made without sincere belief in its truthfulness. *Id.*

The codification of this crime in American law has reflected the diversity among the states. As Perkins & Boyce explain:

> There have been variations in the statutory plan. One plan has been to group all criminally false oaths into one offense known as "perjury"; another has included distinctions which may take the form of different grades or degrees of perjury, or may retain the common-law scheme of one offense known as "perjury" and another called

---

[8] An interesting discussion of this early development can be found in *Hourie v Maryland,* 53 Md App 62; 452 A2d 440 (1982), aff'd 298 Md 50; 467 A2d 1016 (1983).

"false swearing." Under the latter plan, as at common law, false swearing is in the nature of a lesser included offense, convictable under a charge of perjury. Needless to say, since the greater includes the less, one corrupt oath will not support convictions of both. Whatever plan is used there has been a tendency to enlarge the field of punishable sworn falsehood, as will be emphasized presently. And where precision is not required there is a tendency to use the word "perjury" throughout, despite the fact that some jurisdictions have a different label for a part thereof. [*Id.,* p 512.]

Michigan follows the variation in which perjury is divided into two grades. The higher offense, described in MCL 750.422; MSA 28.664, is the modern successor of the common-law crime of perjury. This provision entitled "Perjury Committed in Courts," penalizes "[a]ny person who, being lawfully required to depose the truth in any proceeding *in a court of justice* shall commit perjury . . . ." The other offense, under which Ramos was convicted, is described in MCL 750.423; MSA 28.665 and represents the successor of common-law false swearing. This provision penalizes "[a]ny person authorized by any statute of this state to take an oath, or any person of whom an oath shall be required by law, who shall wilfully swear falsely in regard to any matter or thing, respecting which such oath is authorized or required . . . ." It would appear undisputed and inescapable that this latter statute is addressed to statements made in an extrajudicial setting. Perkins & Boyce, *supra,* p 512, n 16.

This portion of the historical development of perjury explains how a perjury prosecution may be authorized by the Social Welfare Act. It does not explain how Ramos could be convicted of perjury predicated on false swearing without the adminis-

tration of an actual oath. This second question requires an understanding of the word "oath."

There are two common meanings of the word "oath":

> In its broadest sense, the term is used to include all forms of attestation by which a party signifies that he is bound in conscience to perform the act faithfully and truly. In a more restricted sense, it excludes all those forms of attestation or promise which are not accompanied by an imprecation. [Black's Law Dictionary (5th ed), p 966.]

The broad sense of the word has often been held to include the signing of a statement "under the penalties of perjury."[9] Thus, it has been held that such a phrase demonstrates the intent of the Legislature to have the phrase serve as an oath or affirmation, *Nimmo v Wyoming*, 603 P2d 386 (Wy, 1979). One commentator also has explained that the phrase is the legally recognized equivalent of an oath:

> Recently an additional substitute for an oath has made its appearance, this one being provided for the convenience of the declarant. It is by virtue of legislation providing for certain signed statements (such as the declaration of an income tax return) to be made expressly "under the penalties of perjury." The quoted words are a part of the signed declaration, and the statute provides the same penalties as for perjury if the signer does not believe the statement to be true and correct as to every material matter.
>
> Where precision is not required there is a ten-

---

[9] See *American Civil Liberties Union v Los Angeles Bd of Ed*, 59 Cal 2d 203; 28 Cal Rptr 700; 379 P2d 4 (1963), cert den 375 US 823 (1963), *People v Laws*, 120 Cal App 3d 1022; 178 Cal Rptr 102 (1981), *People v Doss*, 99 Ill App 3d 1026; 55 Ill Dec 349; 426 NE2d 324 (1981), *Valdez v State*, 300 Md 160; 476 A2d 1162 (1984), and *Nimmo v Wyoming*, 603 P2d 386 (Wy, 1979).

dency to employ the word "oath" to include a legally-recognized equivalent as well as an oath itself, and at times this has been expressly authorized by statute. [Perkins & Boyce, *supra,* p 513.]

Section 25 of the Social Welfare Act utilizes precisely this oath substitute. As Perkins and Boyce observe:

> The most recent substitute for an oath is not "administered" in any strict sense of the term. It is merely a declaration signed "under the penalties of perjury." Such a declaration, however, has no legal significance unless made under authority of an appropriate statute. [*Id.,* pp 513-514.]

Thus, in the absence of the statutory language of § 25, if an applicant for welfare assistance voluntarily wrote "under penalties of perjury" over his signature, there would be no statutory authorization for a prosecution of perjury predicated on false swearing. Similarly, I would agree that there could be no criminal liability if the phrase appeared in a printed form prepared by the agency, but its insertion was without statutory authority. Anno: *Criminal offense of perjury as affected by fact that affidavit or statement under oath upon which charge of perjury was predicated was requirement not of statute, but of boards or officials in administration of statutes,* 108 ALR 1240. Here, by contrast, as the majority does not dispute, § 25 of the statute authorizes the declaration to be made under the penalties of perjury and the declaration was in fact so made. The Legislature has thus made criminally cognizable a declaration made under the penalties of perjury.

Similar legislative schemes can be found elsewhere in Michigan law. Under § 3(a) of the cigarette tax act, 1947 PA 265, MCL 205.503(3)(a);

MSA 7.411(3)(3)(a), license applications for the sale of cigarettes must be signed "under penalty of perjury . . . ." Section 104(3)(c) of the Michigan revised uniform limited partnership act, MCL 449.1204(3)(c); MSA 20.1204(3)(c), specifies that "The execution of a certificate [of limited partnership] by a general partner constitutes an affirmation under the penalties of perjury that the facts stated in the certificate are true." These statutes do not authorize the administration of an actual oath or affirmation and do not provide a specific penalty for this form of perjury.[10]

It is entirely consistent with the purposes underlying the Social Welfare Act[11] (and similar administrative regulations) to do away with the costly and burdensome formality of a notarized signature. Those purposes do not suggest that the Legislature intended to eliminate criminal liability for false swearing on assistance applications, but only, in the words of Perkins & Boyce, that the Legislature intended to provide an alternative "for the convenience of the declarant." Perkins & Boyce, *supra,* p 513. Indeed, on its face, both the statutory language and the language of the application form create criminal liability for perjury. Any other reading of § 25 of the Social Welfare Act effectively renders the phrase "under the penalties of perjury" mere surplusage or, in the words of defense counsel "disinformation." I can accept neither assessment of legislative purpose, since a

---

[10] In addition to these legislative schemes, Chapter 53 of the Revised Judicature Act, 1961 PA 236, addressing receiverships for wage earners, requires that the debtor's list of creditors be filed "in the form of a petition under oath and under the pains and penalties of perjury . . . ." MCL 600.5305; MSA 27A.5305.

[11] The primary purpose of ADC assistance is protection of needy children, although the needs of a parent or relative with whom the child is living may be considered in determining the amount of aid. *Evans v Dep't of Social Services,* 22 Mich App 633, 638; 178 NW2d 173 (1970).

reasonable construction of the phrase gives it
meaning and effect. See 2A Sands, Sutherland
Statutory Construction (4th ed), § 47.37, p 258.

Assuming that the false swearing perjury stat-
ute renders criminal statements made in an extra-
judicial setting, and that the phrase "under pen-
alty of perjury" encompasses both an oath and an
affirmation, the majority responds that this con-
struction of § 25 of the Social Welfare Act is not
reasonable because it conflicts with § 1432 of the
Revised Judicature Act:

> The usual mode of administrating oaths now
> practiced in this state, by the person who swears
> holding up the right hand, shall be observed in all
> cases in which an oath may be administered by
> law except in the cases herein otherwise provided.
> The oath should commence, "You do solemnly
> swear or affirm." [MCL 600.1432; MSA
> 27A.1432.][12]

According to the majority, this section of the
Revised Judicature Act does not authorize the use
of oath substitutes and therefore the Legislature
did not intend that defendant could be convicted of
perjury predicated upon false swearing.

My reading of this statute indicates that it was
intended by the Legislature only to prescribe the
method of administering oaths in judicial proceed-
ings. As early as the 1857 compilation by Justice
THOMAS M. COOLEY, the present § 1432 of the
Revised Judicature Act appeared in tit 29, *Of
Proceedings in Personal Actions,* ch 127, *Of Evi-*

---

[12] Another oath substitute is contained in § 1434 of the Revised
Judicature Act which provides:

Every person conscientiously opposed to taking an oath may,
instead of swearing, solemnly and sincerely affirm, under the
pains and penalties of perjury. [MCL 600.1434; MSA 27A.1434.]

*dence,* § 4333. In the 1882 compilation by Andrew Howell, the same statute can be found in tit 30, *Of Proceedings in Personal Actions,* ch 262, *Of Evidence,* § 7537. In the 1897 compilation by Lewis Miller, the statute appeared in ch 18, *Of Proceedings in Civil Actions,* Subchapter 282, *Evidence,* § 10136. In the 1915 compilation, this statute appears in tit 14, *The Judicial Department,* ch 17, *Evidence,* § 12568. In the 1929 compilation, the same statute appears in tit 27, *Judicial Department,* part 1, *Courts and Procedure,* ch 266, *The Judicature Act,* subchapter 17, *Of Evidence,* § 14234. In the 1948 compilation, the statute again appears under subchapter 17 of the Judicature Act, entitled *"Of Evidence."* However, in the Revised Judicature Act, 1961 PA 236, the method of taking oaths was moved to ch 14, which contains general provisions for the conduct of court business. There, the provision remained in the 1979 compilation. See 1979 CL 1432. In every compilation since 1857, the statute cited by the dissent has appeared in the compiled laws in portions dealing with judicial proceedings. Indeed, for the most part, this statute has been specifically codified under subchapters addressed to the taking of evidence. Moreover, although exceptions may be found, the thrust of the Revised Judicature Act as a whole is judicial and ancillary proceedings. Thus, the preamble to the Revised Judicature Act provides:

An ACT to revise and consolidate the statutes relating to the organization and jurisdiction of the courts of this state; the powers and duties of such courts, and of the judges and other officers thereof; the forms and attributes of civil claims and actions; the time within which civil actions and proceedings may be brought in said courts; pleading, evidence, practice and procedure in civil and

criminal actions and proceedings in said courts; to provide remedies and penalties for the violation of certain provisions of this act; and to repeal all acts and parts of acts inconsistent with, or contravening any of the provisions of this act.

Contrary to the majority, I believe that the only reasonable view of § 1432 of the Revised Judicature Act leads to the conclusion that it has originally and consistently been limited to the taking of oaths in judicial proceedings. Furthermore, even if the statute were read to govern an oath administered in extrajudicial proceedings, defendant offers no support for the conclusion that it is the intent of the Legislature that perjury predicated on false swearing not be punishable under the Penal Code in the absence of an oath. Since the majority does not contest that perjury may occur in extrajudicial settings, the logical result of defendant's argument is that in *all* legislative schemes in which reference is made to statements made under the penalties of perjury, the Legislature intends that an actual oath be administered for the conduct to be punishable as perjury.

Even if I were to assume, contrary to all indications in the history of RJA, § 1432, that it applies to extrajudicial oaths, I would not be inclined to conclude that it thereby invalidates the oath substitutes subsequently created by the Legislature. To do so would be to impose a rigid and artificial standard of linguistic consistency upon the continuing acts of the Legislature. As one commentator has explained:

Experience indicates that a legislature does not deliberately enact inconsistent provisions when it is cognizant of them both, without expressly recognizing the inconsistency. The critical question concerns how reasonable it is to assume that legisla-

tors and members of the public know the provisions of other acts on the same subject when they consider the meaning of the act to be construed. Even in the case of an act which refers to a prior one, although the reference makes discovery of the prior act possible, one cannot be certain that discovery will occur. These are the considerations which help determine if statutes should be construed together.

It is unrealistic to assume that whenever the legislature passes a statute it has in mind all prior acts relating to the same subject matter. The legislature may have had in mind some but not all of the statutes relating to the same subject matter when it enacts a statute. Perhaps in the case of a highly important act, the legislature, or the draftsman may have considered all prior statutes relating to the same subject, but in the absence of some evidence that the legislators were cognizant of the other statutes the presumption should be rejected and the act not so construed in pari materia until all other means of determining the intent of the legislature have been exhausted. Then on the basis of the desirability of maintaining certainty in the law should the presumption be utilized and the statutes construed together. This principle that such statutes should be construed in pari materia is a restatement of the presumption against the implied repeal of statutes. [2A Sands, Sutherland Statutory Construction (4th ed), § 51.01, pp 450-451.]

As previously noted, other states have recognized the signing of a document "under the penalties of perjury" as an oath substitute and have allowed perjury prosecutions for false statements in these documents.[13] As the majority has carefully pointed out, these other states also have enacted statutes specifically authorizing perjury prosecutions for falsification of these documents. Where the Legislature has enacted such statutes, the

13 See n 9.

intent to criminalize false swearing is clear. What the majority fails to explain is why it should logically or legally follow from the oath provision in the RJA, that although § 25 uses the phrase "under penalty of perjury" and the Penal Code criminalizes extrajudicial perjury, our Legislature does not intend that a statement "under penalty of perjury" be prosecuted as perjury.

Stripped to its essentials, the majority's formulation is as follows: The general perjury provision does not say that any person who verifies a statement by a written declaration that is made under the penalties of perjury, is guilty of perjury. The Social Welfare Act provides only that the application shall be made "under the penalties of perjury." The RJA proscribes the form of oath. Therefore, despite the common legislative reference in regulatory statutes to statements made or verified under penalty of perjury, we must conclude that the Legislature does not intend to make such statements punishable under the Penal Code of this state. This formulation effectively renders the "penalties of perjury" language in § 25 of the Social Welfare Act nugatory.

The question raised by § 25 of the Social Welfare Act is ultimately one of legislative purpose and that purpose is evident in the act itself. No due process question of vagueness is raised by the defendant, nor are we inclined to believe that such a challenge would prevail. See *Boyce Motor Lines, Inc v United States,* 342 US 337; 72 S Ct 329; 96 L Ed 367 (1952).[14]

---

[14] As noted by Perkins & Boyce, the modern federal scheme also uses the phrase "under the penalties of perjury" as a substitute for the administration of an oath. Federal law expressly provides:

Whoever—

* * *

(2) in any declaration, certificate, verification, or statement

In sum, I would reject the defendant's contention that no "oath," as required for a perjury conviction,[15] was administered. The Penal Code authorizes punishment for extrajudicial false swearing, and § 25 of the Social Welfare Act indicates that the signing of the assistance application by Ramos under the penalties of perjury was intended by the Legislature as a substitute for the administration of an actual oath. I would also reject the defendant's contention that prosecutions

> under penalty of perjury as permitted under section 1746 of title 28, United States Code . . . , willfully subscribes as true any material matter which he does not believe to be true;
>
> is guilty of perjury and shall, except as otherwise expressly provided by law, be fined not more than $2,000 or imprisoned not more than five years, or both. This section is applicable whether the statement or subscription is made within or without the United States. [18 USC 1621.]

The second paragraph of this statute was added in 1976 by PL 94-550 and now allows perjury prosecutions in many instances in which a signature is provided under penalties of perjury. See, e.g., *Dickinson v Wainwright,* 626 F2d 1184 (CA 5, 1980). This observation is important because the majority relies upon the reasoning of *People v Kasparis,* 107 Mich App 294; 390 NW2d 241 (1981), which in turn cites *Escobar v United States,* 388 F2d 661 (CA 5, 1967), cert den 390 US 1024 (1968), for the proposition that the phrase "under the penalties of perjury" is of purely historical significance and will not support a conviction of perjury. The *Escobar* decision, however, was based upon the unique statutory history of the Internal Revenue Code and 26 USC 7206. *Escobar* explains that a predecessor statute within the Internal Revenue Code allowed prosecutions under the perjury statute of the Federal Criminal Code. A later revision of the Internal Revenue Code added a criminal enforcement provision limited to tax violations, but retained a reference to documents subscribed "under the penalties of perjury." *Id.,* p 664. The *Escobar* court quite reasonably concluded that the congressional addition of express criminal provisions within the code itself indicated a legislative intent not to penalize perjury under the general perjury provision of the Criminal Code, but only to reference those documents that might create criminal liability under the Internal Revenue Code's own criminal provision. Michigan's Social Welfare Act has no similar history and therefore evidences no similar legislative purpose. Indeed, *Escobar* is itself the exception within the body of federal law.

[15] 4 Torcia, Wharton's Criminal Law (14th ed), § 611, p 335; Perkins & Boyce, *supra,* p 514.

of perjury predicated on false swearing are not authorized by the Social Welfare Act, since the plain language of § 25 of the act authorizes criminal liability in perjury for false statements and omissions. In short, I would decline the defendant's invitation to transform the mere waiver of a burdensome formality into a grant of statutory immunity.

### B. WAS THE FALSE STATEMENT IN THE DEFENDANT'S APPLICATION PROPERLY FOUND TO BE MATERIAL?

Section 56g of the Social Welfare Act, MCL 400.56g; MSA 16.456(7), provides in part:

> (1) Aid to dependent children may be provided to a dependent child or family who, in addition to the requirements under section 56 meets the following:
> (a) Does not own tangible and intangible property having a market value in excess of $1,500.00 for a single individual, or if a family group, the tangible and intangible property of the family group does not exceed $2,000.00. The following is excluded in making the determination of the value of tangible or intangible property: . . . (iv) property used in earning income, including farm stock or implements, horses, cattle, poultry, power machinery and motor powered vehicles or tools, equipment, or an automobile necessary for attaining or retaining remunerative employment and having a fair market value of less than $750.00.

In pretrial motions to dismiss, the defendant argued that the Kubota tractor was exempt under § 56g(1)(a)(iv) because it was property used to earn income. The defendant theorized that assistance would therefore have not been denied even if he had listed the tractor on the application form and that his failure to list the tractor was therefore

immaterial to the administrative proceeding. The defendant pointed out that materiality is a requisite element of the crime of false swearing, see *People v Kert,* 304 Mich 148, 154-155; 7 NW 251 (1943), and argued that, since the omission of the tractor was not a material fact, the perjury charges must be dismissed.

The trial court denied the defendant's motion, reasoning that the purposes for which he purchased and held the tractor were questions of fact for the trial court. Specifically, the trial court observed:

> I think you're right to this extent, that in order to sustain the charges the prosecutor must show that disclosure of the purported ownership of the Kubota tractor would have been material, which means if such disclosure would have effected the outcome of the determination of eligibility to receive benefits, you're probably right there, but when you ask me to dismiss this case without giving him a chance to do so, then you're not bringing the motion as a matter of law, you're bringing a motion as a matter of fact; and I expect I can't even deny you the right to do that if you want to put those facts in front of me. I'm here to listen to them, but I don't have any testimony on those facts or any evidence on those facts.

Thus, it is clear that defendant was seeking a determination as a matter of law that the front end loader was property "used in earning income," an issue that clearly could not be resolved without a testimonial record.

The defendant rested without presenting any testimony and requested a jury instruction that it must find that the statement, if believed, "could have affected the grant of benefits. That is, if the statement was material to the grant of benefits." Defendant further requested that the jury be told

that if it found that the tractor and loader "is property used or intended to be used in earning income, then you must find that the property is properly excluded from making a determination of property owned and that the disclosure was not material in that it would not have affected the defendant's grant of assistance."[16] The trial court charged the jury that they must find that the statement was one which if believed could have affected the course or outcome of such public assistance, but declined to give the second portion of the instruction requested.

First, the instruction regarding materiality was essentially that requested by defendant in the initial part of the instruction. Second, the instruction properly defined materiality as material to a matter in issue, in this case to the defendant's eligibility for assistance. Thus, as this Court observed in *People v Almashy,* 229 Mich 227; 201 NW 231 (1924), in a question as to the sufficiency of a surety, the Court's determination as to what property the defendant owned was material since the issue before the Court concerned the financial responsibility of the defendant. Likewise, while it is correct that if the property was income producing it would have been exempt, disclosure that the defendant owned the property had to be made to determine that fact and thus the defendant's eligibility for assistance. The test of materiality is not the actual effect of the alleged falsity, but the capacity to influence "the tribunal" on the issue

---

[16] I note that the defendant failed to interpose an objection to the instruction and has also failed to move for a new trial on the basis of the alleged instructional error. See *People v Handley,* 415 Mich 356, 360; 329 NW2d 710 (1982); *People v Kelly,* 423 Mich 261, 271-272; 378 NW2d 365 (1985). I also note that the defendant put forth no substantive evidence disputing his equity in the tractor or his purposes in acquiring the tractor, while the prosecution submitted evidence that the tractor was purchased and owned by the defendant for personal use.

before it. *United States v Masters,* 484 F2d 1251 (CA 10, 1973); *United States v Molinares,* 700 F2d 647 (CA 11, 1983); *United States v Flowers,* 813 F2d 1320 (CA 4, 1987).

The defendant's contention that the instruction was erroneous because the jury could have found Ramos not guilty of welfare fraud and guilty of perjury for precisely the same act illustrates a misunderstanding in the elements of the two charges. Perjury requires only a wilful false statement, material to the issue being considered; welfare fraud requires a false statement that is intended to or does result in the applicant's receiving benefits in excess of those to which he is entitled. See Perkins & Boyce, Criminal Law (3d ed), p 511. Cf. MCL 400.60; MSA 16.460. The first statute penalizes conduct that is material to the agency's determination of eligibility, the second to the actual outcome of the agency's action. The first is a question whether a perjured statement could have affected the outcome; the second, on this record, is a question whether it did, in fact, effect the outcome.

Finally, were I to agree that the materiality of perjury is always a question of law, I would find no error here. Defendant requested a materiality instruction, and the trial court submitted the question to the jury. If it was incorrect to submit this issue to the jury, this is clearly an error of which the defendant cannot complain. See *People v Kert, supra.*

### III

### CONCLUSION

Finding no merit in the remaining issues, I would affirm the decision and order of the Court of

Appeals, upholding both of the defendant's convictions and sentences.

GRIFFIN, J., took no part in the decision of this case.